I rhetorically ask you how you are today, with a certain emphasis on the word today, to underscore the common-sense notion that I am asking about now, currently, and in the present. Yet, in this case, today has somehow been given a different meaning. On March 8, 2011, Finisar disclosed slowing demand and an inventory correction by customers after recent explicit denials not only of the inventory buildup, but of the possibility of an inventory buildup by its customers. One co-CEO admitted that the company saw the impact of the slowdown a couple of months before the disclosure on March 8, and that it was not limited to just one customer. The other co-CEO admitted that the slowdown was more pronounced starting at the beginning of February. While plaintiffs allege that Finisar knew much sooner, or were at least reckless in not knowing about the inventory buildup sooner, those admissions alone are enough to adequately plead at least two of the alleged false statements alleged. And working backwards from that— Even under the heightened pleading standard here, I mean, and then our precedent, which seems to require a lot of specificity with respect to the allegations. Right. In terms of falsity, the pleading standard should be the who, what, when, and why the statement was false. With respect to the today and the inventory buildup, at bottom, plaintiffs are alleging that the defendants were saying that there was strong demand at a time where they admittedly knew that there was weakening demand. Plausibility comes in with CENTER, and in this circuit, they're certainly intermixed. But the standard is as plausible, equally plausible, and I think it's equally plausible to say that when defendants are saying today demand is strong, that they are, in fact, talking about the current. Counsel, just speaking only for myself, I don't have much difficulty with the falsity, but I'm concerned about the pleading of CENTER and whether there is enough here in the current complaint to demonstrate that Finistar had an intent to defraud or whether instead it simply didn't have sufficient or accurate information from its customers. So would you address what pleading exists in this complaint about CENTER, and then secondly whether there's more that you could have pleaded such that if it isn't sufficient, it should be remanded? Right. Well, in terms of what more could have been pleaded, and the district court mentioned something about having an internal report or evidence to show that defendants were aware of the inventory, that would certainly be smoking gun evidence. But as TLABS and the Supreme Court explained, that you do not need smoking gun evidence to make your case. So working backwards from March 8th and the disclosure of the inventory buildup and slowing demand, what we have are two, the co-CEOs admitting that they knew for a while that demand was limited, and TLABS too, when TLABS came back down from the Supreme Court, I think that's addressed where they say even if defendants thought that it might correct in the future or that by the end of the quarter, which is an argument that's been made by defendants, that demand would rebound, that at the time they were making this statement, that's a false statement. What we do have is also, we have the company touting throughout the class period, we know what our customers need. They have to tell us. We have to know for their needs. We have detailed reports, sometimes bi-weekly reports, telling us... Do you allege that the customers were truthfully telling Finisar about their inventory levels? No. What I'm alleging is that, what I'm alleging is that for five quarters before the class period, analysts are questioning the company. How do these numbers make sense? You're selling more to your customers than they are selling to the end market. But that's pretty far from an intent to manipulate or an intent to deceive, and the issue for me is that they're relying on third parties, their customers, to tell them about inventory because they don't go out personally and count. So at least there's no allegation that they go out personally and count. So I think Judge Wardlaw's asking a version of the same question that is in my mind, which is, what is here that demonstrates or is a strong inference that there's wrongful intent as distinct from bad information? Right. So let's take, for the argument's sake, that it's correct that Finisar did not know the inventory level of their customers, and they genuinely had no idea. Yet at the same time, they're telling the market, we haven't seen any of these issues. We don't see an inventory buildup. Sure, one or two customers could build up. That's reckless for creating an impression to the market under the most recent precedent of Reese vs. Malone. I guess the statement that comes closest, and you started off your argument with this, is the Chairman Raul's statements during January and February where he said, Finisar today finds itself in a very strong demand environment. You're alleging he knew that statement was false when he made it? I'm alleging that he admitted that they knew that it was false when he made it because he said that they had seen a slowdown for a couple of months and in a more pronounced way in February. And while I think the inventory buildup and correction speaks to demand, there are two issues here. One is the inventory buildup, and the other is demand. But to get back to the incentive, I think we have to look at what happened. And the stock chart tells the story. For five quarters, the stock stays the same price or around the same price despite record earnings. And then as soon as the inventory buildup is denied, the stock price shoots up. And it wasn't benign. And it wasn't accidental. It was on purpose. Right after those statements, there's a stock offering for $118 million. And right after those statements, you have insider sales selling at 40 and heightened levels for $7 million from insider sales at increased prices. Now, I don't want to be naive in the sense that $120 million and $7 million personal gains might not be as big as some of the more notable frauds over time. But to be able to cash in at a nearly triple price on the offering and inside sales within this short window of a few months is certainly indicative that there was an incentive. Well, you're saying that's circumstantial evidence of scienter. You're saying that's circumstantial evidence of scienter. Yes. And that's sufficient. But you also asked for leave to amend your complaint. And what facts were you thinking about when you asked for leave to amend your complaint? What else would you add? Well, I don't know what we would add at this point. I think we would have to go back and continue the investigation, see what came out. I think we'd have to be more informed by the decisions of the circuit and what the standards are, pleading standards are for recklessness and for omissions. In our most recent complaint, we allege only false statements without omissions. And I think recklessness would play a bigger factor. Could any of the confidential witnesses cited, I'm curious, following up on Judge Wardlaw's question, cited in the complaint support that a customer directly told Finistar about the inventory stockpiling? In our investigation, we haven't found a confidential witness to say that. A lot of the obstacles are that the witnesses, for the most part, are in China and it's hard for us to reach them and there's a fear of speaking. And, you know, in hindsight, it would be nice to maybe make a motion to lift the stay of the PSLRA for very narrowly tailored, focused discovery. That's what I was going to ask you about. Is there anything, was there anything pending in the district court requesting discovery on this specific point? There was not. There was not. But I'd also like to address more the September 8th statement and getting beyond the fact of Santer and whether or not there was Santer for that statement. In the district court's opinion on falsity, I'd like to deal with the parentheticals because I think the district court, legally speaking, misinterpreted Janus. I think Oracle is the controlling case as to when analysts speak for, when analysts disseminate statements made by a company or by its executives. And there's a difference between disseminating and making. But also on the facts here, this is an investor event where investors were present and the co-CEO of Finisar had every intention of reaching investors and the market. And the analyst's report indicates that the title is An Evening with Management of Finisar. He's speaking directly about Finisar and then mentions parenthetically that other companies have made similar denials. Not coincidentally, one of those other companies actually has a sustained fraud complaint against them with the similar allegations here, Euclera, where they also represented that demand was strong and there was no inventory buildup. And it turns out that that was not the case. I don't think there's any indication or any declaration or any facts supporting the notion that the analyst was somehow informed by third parties or by the competing companies of Finisar. And I think that that should be clarified with what Jana says and what Oracle says and how the two are different. I'd also like to, in my closing time, point you to the issue of puffery and whether or not strong can be actionable. In our briefs, we cite to Gilead and Oracle as being on point. Those cases were not refuted in Apelli's brief. Last week, they sent a letter adding two new cases, Apollo and Intuitive, on the subject. And while I think those facts are easily distinguishable, I'd also like to point out Ninth Circuit precedent that a later three-judge panel cannot overrule a previous three-judge panel, absent some intervening statements by the Supreme Court, and that Gilead and Oracle would still control and where statements of strong demand, when you know there is not strong demand, would be actionable. And that speaks directly to January and February statements. If there's no further questions, I'll reserve my time. You may do that. Thank you, Mr. Berg. May it please the Court, good morning, Your Honors. Shirley Weiss, DLA Piper for the defendants. And may I also introduce David Preeby with me, and my client's general counsel, Christopher Brown, and Joshua Shinnick, also counsel with FINISAR. Your Honors, the Private Securities Litigation Reform Act imposed the highest pleading standards for pleading securities fraud known to the civil law. Those pleading standards are as follows, with respect to a challenged statement, alleged to be misleading, the plaintiff must set forth particular facts showing why it was misleading at the time it was said. Well, counsel, you know, again, the bar is high, but it's not insurmountable. And I guess to my way of thinking, there's sufficient information in the complaint to demonstrate falsity. My issue, as I mentioned to opposing counsel, is with Scienter. Why isn't the list of allegations that opposing counsel described sufficient to create an inference, a strong inference of Scienter? Not at all, Your Honor, and I'll come back to falsity. But first of all, the stock sales did not occur. What plaintiff is referring to is the reservation of stock by the company. This is a transaction between the company and Mr. Rawls or Mr. Guiton, but Mr. Rawls sold no stock. His stock was deducted at the time of vesting. The company holds on to a non-stock sales, number one. But there also are allegations in the complaint from confidential witnesses that it's industry practice for a customer to explain the level of their inventory in negotiations before they send in a purchase order, and that specifically the customers generally have told Finisar their demand volume and that they receive these forecasts. Why isn't that enough to show that they actually knew that their statements were false and made the statements anyway? They're not at all sufficient, Your Honor. If Your Honor scrutinizes those allegations, all they say is that confidential witnesses generally say that inventory and pricing are discussed in negotiations, and nowhere is it alleged that Finisar was told that their customers were stockpiling inventory. Well, if there's my question, I guess that's my question. Why can't we infer that they discussed them accurately? Well, Your Honor, because that's not an inference that you can draw that is cogent and compelling. When you have an inference, you have to have an inference that is at least as cogent and compelling for Scienter. And there is no basis in order to infer that the inventory levels were being communicated precisely to Finisar and accurately. And in fact, the inventory customers have every reason not to communicate accurately. They want to. There has been a historical supply shortage, and in order to get an allocation, why on earth would they be accurate? And even if they were not intentionally being inaccurate, they are motivated to do their own forecasts on the high side and to err on the side of their own forecast. So Finisar's information is twice removed. This is distinguished from Reese and Gilead, where the company itself was aware of the corrosive pipes or the fact that they were off-selling labeling. Here, Finisar is dependent on what information it is receiving from a third party. So you're saying the plaintiffs, I guess I'm just trying to figure out what, in your view, that the plaintiffs need to allege the customers discussed the inventory levels and that they revealed an inventory buildup? Your Honor, there's nothing. If you take a look at those confidential witness allegations No, no, no. But I'm just saying, is that what you're saying is required? Because that seems like that's almost impossible. I mean, a very difficult hurdle. No. I think that's exactly what they need to say. They need to say that their confidential witnesses said that they were present at the negotiations or that they saw the communications and that Finisar was told that the customers were stockpiling or building up inventory. Only that renders ‑‑ I mean, if you take a look at Mr. Eton's They'd have to figure that out before any discovery. Absolutely, Your Honor. The PSLRA is crystal clear about that, that plaintiff cannot use discovery to augment their allegations. And if you take a look at Mr. Gertel's statement, he's ‑‑ he doesn't pretend to have perfect knowledge. He says, well, a couple of people could be stockpiling, but it's not visible. Counsel, let me give you an example. I'm looking at paragraph 66, for example, where confidential witness number one was personally involved in making purchases from Finisar and that customers, and I'm leaving out some words, but that customers tell Finisar the volume of demands in advance, four weeks or more before making the purchase, and that during the annual negotiations, that this person discussed with Finisar the projected volume of orders and the current year's volume. So you're asking us to assume that the amounts that are discussed in those discussions are false or inaccurate? Your Honor, all it says is that there was discussions over a three-month period of time. This is dynamic time period. The discussions are not finalized until December. I know, but your argument seems to be that we have to assume that when the customers reveal their demands or their inventory levels, that we have to assume that they weren't telling the truth. I think, Your Honor, on the basis of those allegations, there is no reason for the court to draw an inference that there was an accurate transmission of information on a real-time basis during this time period. I find the most troubling statements, and it seems as though the defense was being prepared with these March 8th statements, combined with the fact that Mr. Rawls and Mr. Gertel both admitted and stated that they saw reduced demand and had seen a slowdown for a couple of months before the March 8th announcement. And so, I mean, he says, well, we have clearly learned here in the last month or so from several of them that all of a sudden, surprise, surprise, they have some pretty good-sized Well, which took place one or two months later, that both Mr. Rawls and Mr. Gertel admit they had already seen the slowdown. Well, Your Honor, with respect to demand, I think if you look at the statements about demand that are made by Mr. Rawls that are challenged, they are referring essentially to the demand that is being depicted to analysts, which is the historical demand. Clearly that demand was strong. But even if you take those states out of the room and they had seen it been reduced over the last couple of months, which during that time they had also made statements contrary to that admission. They had, during, like, the January 1 and February statements. But they didn't, Your Honor. The district court found that those statements related to historical. I know what the district court found, but we have to make our own findings. But Your Honor, taking a look at those statements in Well, it's one way to interpret it. You can interpret it other ways as well. Well, Your Honor, I think that if you look at it in context, first of all, even if you take the statements out by themselves, the statement that demand is strong in case after case after case has been found nonspecific in order to support fraud. Demand was still strong. They beat expectations in the third quarter, which is what they announced. The State of Minnesota today finds itself in a very strong demand environment. That's a true statement, Your Honor. I mean, that is not tethered to a percentage or, you know, a particular level or, and it was a true statement. They beat analysts' expectations even for the third quarter. And he is coming off of looking at, I mean, he's saying basically today, you know, I'm showing you what we've done. And his reference, his point of reference is the past. But even if it wasn't the point of the past, Your Honor, the mere statement demand is strong, it was still strong even as of that date. And it is. What's a circumstance in which a statement that demand is strong would be actionable under securities law? Well, I think, Your Honor, if there are circumstances where, you know, the plaintiff, the defendant or the plaintiff alleges with specificity that at the time that the defendant is making that statement, he has been told that he's not going to get orders that he had projected to the public, that might be a circumstance where there might be misrepresentation. I think basically what plaintiff is pointing to is in March, Mr. Rawls is saying with hindsight okay, yeah, a couple of months ago, so that if you back it up a couple of months ago, if it's to the day, you're basically saying that first week in January, Mr. Rawls should have realized that demand was not strong, when in fact I think the indications overall to them was that demand remained very strong. You're challenging falsity and scient. Totally, Your Honor. Tell me about falsity. Why isn't falsity met here? Well, I think, you know, to take them kind of one at a time, first of all, with respect to the September 8th statement, excuse me just a second, there's nothing, Your Honor, in the record that shows that on September 8th, 2010, inventory levels had increased or stockpiling had occurred. There's absolutely nothing in the record that points to that statement being false. Number one. Number two, under the law of Janus, that statement where, you know, the analyst basically characterizes a statement and groups it with two other companies, that cannot be attributed to Mr. Gertel. Mr. Gertel is actually not specifically referenced with respect to that statement. So that statement cannot be judged to be false at all. With respect to the December 2nd statement, what Mr. Gertel is saying is on the telecom side, there can be one or two guys who try to build their own inventory, but by far the majority of customers are expediting products. That means they're putting in orders to us. This is, you can take this to the bank. We've got orders. And it doesn't look to us, not visible to us at all, all these quarters, if they are building any inventory. That's hardly a definitive statement that they've been told or that they know that they know for sure what their customers are doing. Except that when they were asked about the buildup of inventory, they could easily have said we're not sure, we don't know, we have to rely on our customers. But instead they said, no, there's no buildup. Well, no, I don't think that's what he said. He says it's not visible to us. It's not visible to us. That means we are not, we don't have visibility. That means we don't know for sure. And yes, they do, there's no question, they ask questions of their customers. But you have to put that side by side with the statements that I was referring to earlier that said that they were told on a rolling basis what the inventories were by their customers, which takes us back to the question of whether we have to assume that those statements were false by the customers to Finisar. Your Honor, I don't think you can infer that strong a statement from the allegation about the confidential witness. It is intentionally vague about what was discussed. All that witness says is this was discussed. They don't say Finisar was told that we're putting aside, whatever euphemism they wanted to use, we're putting aside additional inventory just in case. There's no allegation to that effect. And it is intentionally vague. The other confidential witness wasn't there and has no standing to say what occurred. And it's doubtful whether or not this person was there during the entire negotiation period. So I think the Court is reading way too much into that confidential witnesses' allegation. I mean, I think counsel admitted themselves they weren't able to get the information. I don't think you even really, are we back on, are we still on falsity or whatever you want to be on? But I'd like to hear on Scientur. And so. Scientur is my issue, too. What do you, I mean. What's your best argument on Scientur? Well, Your Honor, again, the, you have to have specific facts raising a strong inference of Scientur. You have no stock sales at all by Mr. Rawls. And with respect to Mr. Gertel, they are these $25,000 programmed increments. They don't, there's no allegations that they're suspicious in context. In other words, here's what he had, this is what he did. They don't have the air of suspicion in context. What do you make of the allegation in paragraph eight, that the information regarding demand, inventory, and pricing disclosed to investors on March 8, 2011, was known to defendants throughout the class period, which started September 8, based on the fact that the negotiations had to end by December and the prices were set by January? Because prices and inventory buildup are two completely different things. Parties can. No. Well, no. I mean, they would certainly have an impact on each other economically. Not necessarily, Your Honor. There's just not a linear relationship between negotiation for prices and inventory buildup. You know, the fact that I'm negotiating a price with If you didn't need as much of the WSS thing, then maybe you would not be willing to pay as high a price for it. Well, I mean, obviously what they're communicating to Finisar is that they have a great need. They have a great demand. And that's what's being communicated to Finisar. What they're not communicating to Finisar is that they're having a great demand because they're stockpiling. They are not motivated to Did you answer this, or was this dismissed before you answered? No, this was dismissed with prejudice, Your Honor, before we answered. So the question was, yes, you never answered this completely. Correct. Absolutely, Your Honor. Again, with respect to falsity, the January 11th and February statements, we believe that the court was correct viewing those in context and determining that Mr. Rawls was talking about the demand that was depicted by the results of the company and that even taking those statements by themselves, they are untethered to a comparison and they're not false standing on their own. And the fact that there might have been some slowdown in orders when viewed with hindsight does not mean that demand was not strong and does not mean that demand was not historically strong. And Mr. Rawls was not acting with scienter. There's no reason to conclude that he had an intent to deceive or defraud. He has no motivation to do that. I think, and, you know, his statement later that he was surprised is not challenged by any analyst and it's not challenged by plaintiffs. Thank you, counsel. You've exceeded your allotted time. Thank you, Your Honor. And we appreciate your argument. Thank you. Mr. Berg, you have three point something minutes remaining. Thank you. Let me get right to the bottom of scienter. Recklessness must be considered but was not considered by the district court. In Reese v. Malone, a Ninth Circuit decision which came out during briefing, the court found that it was reckless where it was lending an element of certainty to a situation previously indicating risk. And they were able to bridge the scienter gap in their allegations because defendants discussed inventory. Discussing inventory here is information that would have been discussed if they had made an inquiry. It's just like Reese v. Malone. If they had made an inquiry, they certainly would have made a discovery. When you're asked for five quarters whether or not there's been an inventory buildup, you should inquire. Or if you answer the question, you are at least implying that you have inquired. Gilead says the same thing in this circuit. It created the impression that demand was strong, which it was, but for reasons that were not well understood by investors. If you look to the Third Circuit in Avella, repeated focused questions by analysts not only indicated that the issue was material to investors, but the confident unhedged denials made obvious the risk of misleading investors, made obvious the risk that defendants should have known that there was a risk they were misleading investors by denying something that they had not inquired into. So after five quarters of being asked, is there an inventory buildup, they should have made an inquiry, but they went beyond that. They said, we get very specific rolling forecasts 12 months out. And then they made the statement on December 2nd, it's not visible to us at all, that all of these quarters they are building inventory. It's not plausible that the inventory was built in the week before March 8th or even the month before March 8th. If you just do the math, they had 8 percent growth. You can't build an inventory in that quarter. The inventory was being built over the five quarters in which analysts were questioning it. And the company could have remained silent. They could have said nothing. And like you asked, they could have said, we don't know. But instead they gave denials and said they weren't seeing an inventory buildup, which is reckless. Okay. So it also, just to get to this point that opposing counsel made, you allege that during this same time period defendants sold over 4 million shares of Finisar common stock, and the individual defendants also sold 264,000 shares of their personally held or controlled Finisar stock, making millions of dollars. Opposing counsel says that wasn't a sale. Whether it's – I don't know what that means. It's not a sale. Stock was sold for the benefit of these defendants, whether they had the stock in their possession and sold it or whether it came from the company and then was sold. The point is there's no evidence on what it was. All we have is the Form 4s which are publicly filed that shows stock was disposed of and the benefit went to these defendants. So the amount and the timing may have been predetermined. That may not be suspect in itself. But look at the timing of when it occurred and what the information was known. As alleged, all three defendants had a sale or some disposition on March 8th at a price of $40.40, give or take if my memory is a little off. And it was after those sales, at the end of the business day, after the market closed, that they disclosed, oh, by the way, here's a warning going forward that there's going to be a slowdown in demand and the stock fell 39%. The sales were made the same day as the announcement on? Some were. I do not think it was the bulk of the sales. I think a bulk of the sales came earlier, more towards around the time of the offering, the $118 million, $120 million offering. But again, for five quarters of record growth, a company stock stays flat. Only after they say we have no visibility into inventory buildup, only after they say we have rolling forecasts that tell us what our customers need, our customers have to tell us we need to know, does the stock jump nearly three times? And that's when they do the offering. That's timed with their sales predetermined or tax benefit. There's no evidence on the record of what that is. It's only in their briefing. It's more of a summary judgment issue, as would whether or not these CWs are true, whether or not we can show that this information was discussed during these three months of negotiation. It's a summary judgment issue. Yes, to show scienter, plaintiffs have to show a cogent and plausible explanation, and counter explanations can be considered, but the facts can't just be assumed to be true without any declarations or any evidence of that fact. I think if you go back to recklessness, you'll see the answer. Thank you, counsel. The case just argued is submitted, and we appreciate very much the arguments of both parties.
judges: Wardlaw, Graber, Murguia